AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH ONE CELL PHONE
ACCOUNT STORED AT PREMISES CONTROLLED BY
VERIZON PURSUANT TO 18 U.S.C. § 2703 FOR
INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1512

)
)
)
)
)
)

Case No.  21-SC-3462

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

Located in the _____ District of New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress; 18 U.S.C. §§ 1752(a)(1) and (2) (Unlawful Entry on Restricted Buildings or Grounds); 40 U.S.C. §§ 5104(e)(2)(D) and (G) (Violent Entry and Disorderly Conduct on Capitol Grounds) | |

The application is based on these facts:
See Affidavit in Support of Application for Search Warrant.

❐ Continued on the attached sheet.

❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kellen Grogan, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_telephone_____ *(specify reliable electronic means)*.

Date: ____11/4/2021____

_____
*Judge's signature*

City and state: ____Washington, D.C.____

Robin M. Meriweather
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE CELL PHONE<br>ACCOUNT STORED AT PREMISES CONTROLLED BY<br>VERIZON PURSUANT TO 18 U.S.C. § 2703 FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1512 | )<br>)<br>)<br>)  Case No.  21-SC-3462<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of New Jersey _____.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference). This court has authority to issue this warrant under 18 U.S.C. §§ 2703 (c)(1)(A), and 2711(3)(A).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B, incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____ November 18, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____ 11/4/2021 _____       _____
*Judge's signature*

City and state: _____ Washington, D.C. _____       _____ Robin M. Meriweather _____
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-3462 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

                _____
                     *Executing officer's signature*

                _____
                      *Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to records and information associated with the Verizon Wireless account identified by █████-1908 (the "Account") and which is stored at premises owned, maintained, controlled, or operated by Cellco Partnership d/b/a Verizon Wireless, a wireless telephone service provider headquartered in Bedminster, New Jersey.

**ATTACHMENT B**
**Particular Things to Be Seized and**
**Procedures to Facilitate Execution of the Warrant**

I.     **Information to be Disclosed by Cellco Partnership d/b/a Verizon Wireless ("PROVIDER") to Facilitate Execution of the Warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to the Provider or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following information about the customers or subscribers of the Account:

i.   Names (including subscriber names, user names, and screen names);

ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.   Local and long distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service used;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

       viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  For the time period from January 5, 2021 to January 7, 2021: All records and other information relating to wire and electronic communications sent or received by the Account, including:

       i.  Records of the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses) including web browsing history and text messaging history;

       ii.  Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and

       iii.  Records and information regarding per-call measurement data (PCMD) (also known as Network Event Location Services (NELOS), Timing Delay/Timing Advance (TA), TrueCall, Time on Tower Report, and/or Real Time Tool (RTT) data).

c.  All records pertaining to devices associated with the Account, including the names and phone numbers associated with other devices on the subscriber's plan, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network

2

information, information regarding cookies and similar technologies, and any other

unique identifiers that would assist in identifying any such device(s).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth

above via United States mail, courier, or e-mail to the following:

> Special Agent Kellen Grogan
> Federal Bureau of Investigation
> Washington Field Office
> 601 4th Street NW
> Washington, DC 20535
> kgrogan@fbi.gov

This warrant authorizes a review of records and information disclosed pursuant to this

warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The

review of this electronic data may be conducted by any government personnel assisting in the

investigation, who may include, in addition to law enforcement officers and agents, attorneys for

the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI

may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys

for the government and their support staff for their independent review.

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence, instrumentalities, fruits, and contraband of the violations of 18 U.S.C. § 1512(c)(2) (Obstruction of Justice/Congress); 18 U.S.C. § 1752(a)(1) and (2) (Unlawful Entry on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2)(D) and (G) (Violent Entry and Disorderly Conduct on Capitol Grounds) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence concerning the riot that occurred at the U.S. Capitol on January 6, 2021;

(b) Information that constitutes evidence of the user's presence in and around the U.S. Capitol on January 6, 2021;

(c) Information that constitutes evidence of the user's participation in the riot that occurred at the U.S. Capitol on January 6, 2021, to include travel to and from Washington, DC;

(d) Information that constitutes evidence of any planning and preparation that the user of the account undertook prior to committing the criminal activity under investigation;

(e) Information that constitutes evidence of any steps that the user of the account took to disguise or hide their participation in the criminal activity under investigation;

(f) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(g) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission

4

of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(h) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(i) Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner; and

(j) The identity of any person(s) who communicated with the account about matters relating to the events of January 6, 2021, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review

### III.     Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT STORED AT PREMISES CONTROLLED BY VERIZON PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1512** | **SC No. 21-sc-3462** |

*Reference:*    *Case # 21-mj-245; USAO # 2021R00792; Subject Account:* ███ *-1908*

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Kellen Grogan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for certain location and related information associated with one cellular telephone account assigned the phone number ███ -1908 ("the SUBJECT PHONE NUMBER"), that is stored at premises controlled by Cellco Partnership d/b/a Verizon Wireless ("PROVIDER"), a cellular service provider headquartered in Bedminster, New Jersey.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.    I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have served as a Special Agent with the FBI since March 2012.  Since January 2016 I have been

assigned to one of the Washington Field Office's Extraterritorial Counterterrorism squads and before that to its Joint Terrorism Task Force.  Prior to my employment with the FBI, I was a law enforcement officer in the United States Air Force and Air Force Reserves for approximately ten years.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that PHILIP SEAN GRILLO has committed violations of 18 U.S.C. § 1512(c)(2) (Obstruction of Justice/Congress); 18 U.S.C. §§ 1752(a)(1) and (2) (Unlawful Entry on Restricted Buildings or Grounds); and 40 U.S.C. §§ 5104(e)(2)(D) and (G) (Violent Entry and Disorderly Conduct on Capitol Grounds).  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

# PROBABLE CAUSE

## *Background*

6.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which

3

took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior

4

to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.

USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     An unknown subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





25. At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

26. At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27. At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m., the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate

10

with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:







1

### *Facts Specific to This Application*

37.     According to records obtained through a search warrant served on Verizon, on January 6, 2021, at or about the time of the incident described above, that is, 3:32 p.m., the cell phone associated with the SUBJECT PHONE NUMBER was identified as having utilized a cell site consistent with providing service to a geographic area that includes the interior of the United States Capitol building.

38.     According to records provided by PROVIDER, the SUBJECT PHONE NUMBER is also associated with the following device identifiers: International Mobile Equipment Identity ("IMEI") ████████ 2484.

---

[1]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

39.     Two individuals contacted the FBI tip line and stated that they observed CNN footage of PHILIP GRILLO inside the Capitol on January 6, 2021.

40.     On January 14, 2021, the FBI received an anonymous tip from an individual hereinafter referred to as WITNESS 1.   WITNESS 1 stated that s/he saw PHILIP GRILLO "storm[]" into the Capitol on CNN footage.   WITNESS 1 also said, "I saw him twice in CNN in two separate incidents".   WITNESS 1 stated that s/he knew GRILLO from growing up with him in Glen Oaks, New York.

41.     On January 18, 2021, a tipster, hereinafter referred to as "WITNESS 2," contacted the FBI and identified GRILLO from CNN footage.   WITNESS 2 included a video and an image taken from his/her cell phone of the CNN footage where s/he identified GRILLO.   Screenshots of the image and video WITNESS 2 provided are attached below.   The red oval was inserted by your affiant to identify GRILLO.





42.     An FBI agent met with WITNESS 2 and showed him/her surveillance footage from inside the U.S. Capitol.  WITNESS 2 identified GRILLO in the CCTV footage.  WITNESS 2 stated s/he has known GRILLO for decades, growing up with him and going to the same schools.  WITNESS 2 stated s/he did not require any aids, such as unique clothing, to identify GRILLO, and stated s/he knows his face.  WITNESS 2 also reported that GRILLO was a member of the Knights of Columbus.  The CCTV image from which WITNESS 2 identified GRILLO is pasted below.



43.     In the course of the investigation, your affiant reviewed video footage recorded from inside the U.S. Capitol.  An individual matching GRILLO's description and clothing can be seen in video from the Senate Wing Door climbing into the U.S. Capitol through a broken window

at or about 2:20 p.m.  GRILLO can be seen holding a megaphone in his hand after entering the

building.  Screenshots showing GRILLO's entrance and him holding the megaphone are included

below.  Red circles indicate GRILLO and the megaphone.





44.     About fifteen (15) minutes after he entered the U.S. Capitol through the broken window, GRILLO was captured in a different surveillance camera that faces the Capitol Rotunda interior.  In this video, GRILLO is seen with a crowd of individuals attempting to exit the Rotunda and gain entry to a separate room that contained doors leading outside, where more protestors were

gathered.   The crowd's movement is blocked by three Capitol Police officers trying to stop the crowd's progress.   Eventually the crowd, including GRILLO, is able to move past the officers and towards the Rotunda's exterior entryway doors.   GRILLO was among the first few individuals to get past the officers, although he followed the individual who was standing in front of him. Screenshots from the video footage are pasted below, with GRILLO indicated by a red circle.   At this point, GRILLO no longer appears to be holding a megaphone.





18

45.     Another surveillance video pointed toward the Rotunda exterior doors picked up the crowd after it bypassed the previously-mentioned Capitol Police officers.  GRILLO and the large group of individuals approached the exterior entryway doors, which were barricaded with benches.  Protestors outdoors were clearly visible through the door's windows.  GRILLO and the large crowd gathered at the closed doors while the same three U.S. Capitol Police officers repositioned themselves and again barred the crowd's movement, this time preventing them from opening the exterior doors.  GRILLO was able to move about the crowd, eventually moving from the back to the front and directly in front of the officers.  The crowd ultimately pushed against the officers and against the doors, forcing them open and allowing individuals located outside to gain entry to the Capitol.  At the time the doors were pushed open, GRILLO was standing towards the middle of the crowd and not making direct contact with the officers.  Two screenshots from the Rotunda exterior doors footage are attached below, with Grillo indicated by a red marking.





46.     Once the doors were opened, allowing more protestors inside the building, GRILLO briefly went through the doors only to re-enter the Capitol moments later and remain inside the Capitol.  GRILLO can also clearly be seen recording himself on his cell phone, a screenshot of which is attached below, with red circles to indicate GRILLO and his cell phone.



47.     In the same surveillance footage facing the Rotunda exterior doors, GRILLO can be seen wearing a Knights of Columbus, St. Anne's Council #2429, Glen Oaks, New York embroidered jacket.   The FBI conducted an open-records check of GRILLO and confirmed GRILLO to be a member of the Knights of Columbus chapter, matching the jacket's description. Additionally, as stated above, WITNESS 2 reported to the agent s/he met with that GRILLO was a member of the Knights of Columbus.  A screenshot from this footage is attached below.



48.      In video footage found on YouTube, the back of GRILLO's jacket can be more clearly seen.  A screenshot is pasted below.



49.     In the YouTube footage, which was taken outside the Capitol and near an entryway, GRILLO was with a crowd that is shouting, "Fight for Trump."   This crowd was engaged in a physical confrontation with uniformed officers at the entryway.   Again, GRILLO was near the front of the crowd.   The crowd, including GRILLO, was eventually driven back from the door when officers employed a chemical irritant.

50.     From New York State vehicle registration records, the FBI identified GRILLO as the registered owner of a 2019 Chevrolet Traverse with New York State License Plate number ███████.   The registration is effective as of April 1, 2020.   The address linked to the vehicle's registration is ████████████   Glen Oaks, New York.   A License Plate reader in New York City captured New York License Plate ███████ departing New York City at approximately 9:30 p.m. on January 5, 2021 and returning on January 6, 2021 at approximately 11:20 p.m.   A Secret Service camera located in Washington, D.C. scanned New York License Plate ███████ at approximately 2:10 a.m. on January 6, 2021.

51.     On November 11, 2020, GRILLO posted a brief video from the Facebook page of "DONALD J. TRUMP" to his own page.   TRUMP's post was captioned with "WE WILL WIN!" and a brief video saying to believe in the impossible.

52.     Subscriber information for the SUBJECT PHONE NUMBER shows that the account holder is ████████ and that the address for the SUBJECT PHONE NUMBER is █ ████████████   Glen Oaks, New York.   Other phone numbers on the same account are also registered in ████████'s name.   GRILLO's mother listed the SUBJECT PHONE NUMBER on her passport application as belonging to PHILIP GRILLO in the point of contact section.

53.     I have reviewed PHILIP GRILLO's United States Passport Application from March 7, 2017, which includes a photograph of PHILIP GRILLO.   The photograph of PHILIP

23

GRILLO from the passport application appears to be the same individual who was identified as PHILIP GRILLO in the video footage at the Capitol on January 6, 2021.  On the passport application, PHILIP GRILLO lists "███████" as his emergency contact and states that she is his mother.  The mailing address on the application is ████████ Glen Oaks, New York.

54.     The SUBJECT PHONE NUMBER is also linked to a WhatsApp social media account that has a photograph that I believe to be of PHILIP GRILLO.

55.     On February 22, 2021, GRILLO was arrested and charged by complaint with violations of 18 U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  In a post-arrest interview with law enforcement the day of his arrest, GRILLO admitted that he went inside the United States Capitol Building on January 6, 2021.  He also said that he was drunk at the time, that he did not think he had done anything illegal and did not realize he was trespassing, and that he protected police officers inside the Capitol and did not push past officers.

56.     At the time of his arrest, law enforcement seized GRILLO's cell phone with the SUBJECT PHONE NUMBER pursuant to a search and seizure warrant issued in United States District Court for the Eastern District of New York.  Videos recovered from the cell phone with the SUBJECT PHONE NUMBER establish that GRILLO entered the U.S. Capitol on January 6, 2021.  Some video footage shows GRILLO expressing support for law enforcement.  Other video footage shows GRILLO announcing that they "did it" and "stormed" the Capitol, as well as GRILLO asking others smoking marijuana for a hit and inhaling from it when provided.  Furthermore, in a video from an outside source, GRILLO stated, "I'm here to stop the steal."

57.     The time frame of January 5, 2021 to January 7, 2021 requested in this application covers the date of the Capitol riot and ensures that the times of GRILLO's travel are also captured in light of the information gathered from license plate readers as described above.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

58.     PROVIDER is the provider of the cell services for the SUBJECT PHONE NUMBER.

59.     PROVIDER is a company that provides cellular telephone access to the general public.  As part of the provision of such access, PROVIDER gives its users a cell phone number, voice mail, cell service based text messaging, SMS messaging, the ability to share pictures and video, and cell service based access to the internet.  As part of its regular business practices, PROVIDER stores information about the use of these services and their contents for varying periods of time depending on the service.

60.     Wireless providers such as PROVIDER can provide cell service to more than one phone as part of a package, so that the SUBJECT PHONE NUMBER may be associated with other phones that are paid for by the same subscriber.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account and/or who may have conspired with the user of a particular PROVIDER account.

61.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including Media Access Control address ("MAC" address), an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), a Mobile

Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that cell service providers like PROVIDER retain records of the unique identifiers of their subscribers' cell phones and other devices.

62.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

63.     Wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.

64.     Wireless providers such as PROVIDER typically collect and retain information in their normal course of business about their subscribers' use of PROVIDER's services, including records about calls, text messages, SMS messages, pictures and video or other communications sent or received by a particular device, such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses, and other transactional records.  These records

26

may include the contents of such communications. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE NUMBER's user or users and who they communicated with and when.

65.     Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider typically stores: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

66.     I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers may be a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

67.     Based on my training and experience, I know that PROVIDER also collects Per-Call Measurement Data ("PCMD"). PCMD estimates the approximate distance of the cellular

device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.  This location information is variously known as "NELOS" (AT&T), "TrueCall" and "Time on Tower Report" (T-Mobile), "Timing Delay/Timing Advance" (T-Mobile & Sprint), and/or "Real Time Tool" (RTT) (Verizon) data.  Given the limits of the antenna compared to cell towers, this information is likely to be even less reliable than it is when collected by traditional cell towers.  AT&T's NELOS information can provide an approximate location of the cellular device using a combination of timing advance, Wi-Fi, and global positioning information (GPS).  At times, this information can supplement cell site data when no call or text information is available.

68.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications, as well as PROVIDER-generated information about its subscribers and their location and use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

69.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER account can

indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, text messages, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).  Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

70.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because phones and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

71.     In my knowledge, training, and experience, I know that criminals sometimes use "burner" phones, or cheap disposable prepaid mobile phones when preparing for and committing their crimes. "Burner" phones are mobile phones for which credit is purchased in advance of service use. Burner phones can be bought with cash and with no contract, plus providers that sell these devices often don't track personal data. Burner phones often use a mobile virtual network operator that has agreements with companies like PROVIDER to access cell service, therefore, burner phone records may be included in the information stored by PROVIDER.

## AUTHORIZATION REQUEST

72.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

73.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on PROVIDER, who will then compile the requested

records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

74.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that Assistant U.S. Attorney Christine Macey, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

75.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of the Subject Offenses may be located with the records and information associated with the SUBJECT PHONE NUMBER described in Attachment A. Therefore, I request that the Court issue the proposed search warrant to seize items described in Attachment B.

Respectfully submitted,

_____

Kellen Grogan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on November 4, 2021

_____

HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

31

## **CERTIFICATE OF AUTHENTICITY OF DOMESTIC**
## **RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE**
## **902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ (PROVIDER), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of _____.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here, the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                     Signature